660 A.2d 433

MEDICAL MUTUAL LIABILITY SOCIETY
OF MARYLAND et al.

v.

B. DIXON EVANDER AND ASSOCIATES, INC. et al.

No. 32, Sept. Term, 1994.

Court of Appeals of Maryland.

June 28, 1995.

Reconsideration Denied Aug. 17, 1995.

David M. Funk (Charles S. Fax; Bryan D. Bolton, Shapiro and Olander, all on brief), Nell B. Strachan (Douglas D. Connah, Jr., Mitchell Y. Mirviss, Venable, Baetjer and Howard, all on brief), Baltimore, for appellants.

Robert J. Mathias (Francis B. Burch, Jr., William L. Reynolds, Glen K. Allen, Piper & Marbury, all on brief), Baltimore, for appellees.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, CHASANOW, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge (retired), Specially Assigned.

PER CURIAM.

This case concerns challenges to awards of compensatory and punitive damages in a suit alleging wrongful interference with business relationships.

## I.

The present litigation arose out of a dispute between an insurance agency, Evander, Inc., owned by B. Dixon Evander, and an insurer, Medical Mutual Liability Society of Maryland. In 1989, Medical Mutual insured approximately six hundred doctors through Evander, Inc. During the 1980s, Medical Mutual had achieved a near monopoly in the Maryland medical malpractice insurance market, principally because other providers of such insurance had withdrawn from the state.[1] In 1988, however, two new carriers, Princeton Insurance Co. and PIE Mutual Insurance Co., were approved to sell medical malpractice liability insurance in Maryland.

Evander, Inc. became the "master agent" for PIE Mutual and aggressively promoted PIE's products. Under its agreement with PIE Mutual, Evander, Inc. received substantially higher commissions on PIE policies than on policies issued by Medical Mutual.[2] Nevertheless, Mr. Evander testified that he was not motivated to transfer clients from Medical Mutual to PIE in order to receive a higher income from their business.

---

1. The General Assembly created Medical Mutual in 1975 when St. Paul Fire and Marine Insurance Company withdrew from the Maryland medical malpractice market, leaving many doctors without access to liability insurance. The General Assembly established Medical Mutual so that the victims of medical malpractice could receive compensation for their injuries, and "to provide means whereby physicians or other health care providers may obtain insurance against liability...." Maryland Code (1957, 1994 Repl.Vol.), Art. 48A, § 548. While a few wholly private insurance carriers accepted some Maryland business between 1975 and 1985, they withdrew from Maryland in 1985, again leaving Medical Mutual as the sole source of malpractice liability insurance for doctors in the State.

2. Mr. Evander testified that he received a 10% commission from PIE, whereas Medical Mutual paid an average commission of 2½% of the premium.

Instead, Mr. Evander said that he believed that PIE Mutual offered better terms than Medical Mutual to physicians practicing in certain specialties. Evander, Inc. sent out a brochure comparing PIE's coverage and rates to Medical Mutual's, and Mr. Evander spoke at physicians' meetings as a representative of PIE Mutual. Mr. Evander achieved considerable success in securing business for PIE. Approximately 50 of the 600 doctors represented by Evander, Inc. switched their coverage from Medical Mutual to PIE. In addition, some 275 physicians became new clients of Evander, Inc. and were insured by PIE. Because almost all Maryland physicians had been insured by Medical Mutual before PIE entered the market in 1988, a client secured by Evander, Inc. for PIE was ordinarily a client lost to Medical Mutual.

On the basis of Evander, Inc.'s promotion of a competing insurer, Medical Mutual decided to terminate its relationship with Evander, Inc. It is undisputed that Medical Mutual was entitled to end the business relationship, and that Medical Mutual properly followed the procedures for terminating agents and brokers set forth in Maryland Code (1957, 1994 Repl.Vol.), Art. 48A, § 234B. Under circumstances described more fully below, on May 22, 1989, Medical Mutual delivered to Mr. Evander a termination letter, a copy of a letter sent to each of the doctors whom Medical Mutual insured through Evander, Inc., explaining the consequences of the termination, and a copy of a complaint that Medical Mutual had filed with the Insurance Commissioner against Mr. Evander and Evander, Inc. After the termination, physicians insured with Medical Mutual through Evander, Inc. could no longer use Evander, Inc. as their broker for Medical Mutual insurance. While Mr. Evander was able to retain some Medical Mutual clients by placing their insurance through another broker, William Flynn, approximately 480 of Evander, Inc.'s former Medical Mutual clients either selected a different broker or insured directly with Medical Mutual.

In May 1990, Evander, Inc. and Mr. Evander filed a four count tort suit in the Circuit Court for Baltimore City against Medical Mutual and two of its senior officers, Dr. Raymond

Yow and Richard A. Walker.[3] The plaintiffs claimed damages for defamation (Count I), wrongful interference with business relationships (Count II), tortious "interference with prospective advantage" (Count III), and "injurious falsehood" (Count IV). The case eventually proceeded to trial, with only Count I (defamation) and Count II (wrongful interference with business relationships) being submitted to the jury.

The plaintiffs' basic contention at trial was that Medical Mutual had defamed Mr. Evander and Evander, Inc.[4] As mentioned earlier, when Medical Mutual terminated its relationship with the plaintiffs, it wrote a letter to each doctor then insured by Medical Mutual whose insurance had been placed through the plaintiffs.[5] The letter provided in relevant part as follows:

"Dear Colleague:

"As one of the physicians who guide Medical Mutual, I have listened to members over the past months, and it has become apparent that a few brokers are no longer representing Medical Mutual in a way that many of you feel to be adequate. I regret that we will no longer accept any new physician business from your present broker effective this date and that we will no longer accept renewal physician business from your present broker as of August 25, 1989. *Medical Mutual's termination of its relationship with your broker will in no way affect your relationship with us.*

---

**3.** The trial court granted a motion for judgment in favor of Mr. Walker.

**4.** Throughout the litigation, the plaintiffs have treated Evander, Inc. and Mr. Evander as a single entity because, they contend, "their interests and injuries are identical...." (Brief of Evander, Inc. and Mr. Evander at 1 n. 1).

**5.** Maryland Code (1957, 1994 Repl.Vol.), Art. 48A, § 234B, sets forth the conditions under which an insurer may cancel its agreement with a broker or agent. Section 234B provides, *inter alia*, that an insurer may not cancel or refuse to renew the policy of the insured because of the broker's termination. Consequently, Medical Mutual was obliged to communicate with its insureds to explain the consequences of Evander, Inc.'s termination. *See generally Travelers Indemnity v. Merling*, 326 Md. 329, 605 A.2d 83 (1992).

Your Medical Mutual policy will, of course, remain in force through its correct expiration date. We will also process your renewal in accordance with our underwriting standards, as we do all other renewals. I very much hope that you will want to continue as a member of Medical Mutual.

    \*      \*      \*      \*      \*      \*

"We want you to have the best possible service from our employees and from the brokers who sell our product. We will continue to listen to our members and do whatever we can to help."

The letter was signed by Dr. Raymond Yow, the Chief Executive Officer of Medical Mutual. According to the plaintiffs, the opening sentence of the "Dear Colleague" letter was susceptible to at least three defamatory interpretations: that Mr. Evander was inadequate as a broker, that Mr. Evander was not representing Medical Mutual in a way that many physicians believed to be adequate, and that Medical Mutual was terminating Evander because many doctors had complained of his inadequacy. Moreover, the plaintiffs contended that the "Dear Colleague" letter damaged the plaintiffs' business reputation, and that Medical Mutual had intended, by inflicting such damage, to interfere with the plaintiffs' business relationships with their Medical Mutual insureds.

Medical Mutual's principal defense to the defamation argument was that, since Mr. Evander and Evander, Inc. were aggressively marketing PIE's products, it followed that the plaintiffs were not adequately representing Medical Mutual. Furthermore, Medical Mutual argued that even if the "Dear Colleague" letter were defamatory, the plaintiffs had failed to establish that the alleged defamatory language of the "Dear Colleague" letter, and not the termination of the brokerage relationship, caused the plaintiffs' economic losses.

At trial, Mr. Evander and several of his former employees testified generally that they had received many calls from physicians insured with Medical Mutual, asking what they had "done wrong." When asked to name one of these physicians who had called and asked about wrongdoing, however, neither

Mr. Evander nor the former employees could remember any specific physician who had called. As evidence intended to show the defamatory character of the "Dear Colleague" letter, the plaintiffs secured testimony from Dr. Yow that no physician had, in fact, complained to Medical Mutual about the plaintiffs' "adequacy." Moreover, several officers of Medical Mutual testified that the reason for Mr. Evander's termination was his association with PIE Mutual, Medical Mutual's competitor.

The plaintiffs sought to establish the amount of their damages through the expert testimony of Evander, Inc.'s long-time accountant, Charles Solomon. The plaintiffs showed that approximately 480 of 600 Medical Mutual insureds left Evander, Inc. after Medical Mutual had terminated the brokerage relationship and sent out the "Dear Colleague" letter, and also that PIE Mutual terminated its master agency with Mr. Evander because Mr. Evander was no longer able to bring in business for PIE Mutual. Mr. Solomon estimated that the sum of $1,763,000.00 would compensate the plaintiffs for their economic losses.

The plaintiffs also introduced evidence designed to establish "malice" on the part of Medical Mutual. Howard Friedman, a former officer of Medical Mutual, testified that Eric Hempleman, a Medical Mutual Vice President, stated that Medical Mutual should "shoot" Mr. Evander, apparently as a graphic way of saying that it should terminate Mr. Evander as a broker. On redirect, when Medical Mutual's attorney asked Mr. Hempleman to tell the jury whether he thought Mr. Evander deserved to be "shot," Mr. Hempleman answered "yes."

At the close of the plaintiffs' case, Medical Mutual moved for judgment on a number of grounds. With respect to the plaintiffs' count charging wrongful interference with business relations, Medical Mutual argued that it was entitled to judgment because Medical Mutual and Dr. Yow "were parties to the business relationship allegedly interfered with." Consequently, according to Medical Mutual, the tort of interference

with business relationships did not lie. In addition, Medical Mutual argued that the plaintiffs had failed to establish a causal connection between any allegedly tortious conduct by the defendants and the plaintiffs' economic losses. Medical Mutual contended that the plaintiffs had failed to prove causation because they had failed to trace their economic losses to the alleged defamation, rather than to Medical Mutual's lawful termination of its relationship with the plaintiffs. The trial court denied Medical Mutual's motion for judgment.

As previously stated, the trial court permitted two of the plaintiffs' counts, namely Count I for defamation and Count II for wrongful interference with business relationships, to go to the jury. Before the case was submitted to the jury, the parties and the court agreed that the only wrongful conduct that could form the basis of the plaintiffs' interference count was the allegedly defamatory content of the "Dear Colleague" letter.[6] As the trial court put it, "if the verbal conduct is not defamatory, it's not wrongful, and if it's not wrongful, both

---

6. The plaintiffs had earlier suggested, as an alternative basis for establishing tortious interference with business relationships, that the filing of the complaint with the Insurance Commissioner constituted the separate tort of "malicious use of civil process." The trial court rejected the plaintiffs' suggestion, and the plaintiffs acquiesced in the court's view. Moreover, the tort based on wrongful litigation is directed primarily towards abusive use of the judicial system. Furthermore, even if Medical Mutual's complaint to the Commission was motivated by ill will towards Mr. Evander, it was based upon what Medical Mutual perceived to be inaccurate statements about its products in Evander, Inc.'s promotional materials. Indeed, while the Administrative Law Judge who adjudicated the proceedings based on the complaint found that Mr. Evander had not violated any provisions of the Insurance Code, that finding was based, at least in part, on the conclusion that omissions in Mr. Evander's materials fell "within the realm of negligence, rather than intentional misrepresentation." Under these circumstances, Medical Mutual's complaint to the Insurance Commissioner, pursuant to the statutory process established for the receipt and resolution of insurance complaints, cannot form the basis of a retaliatory tort suit.

The trial court instructed the jury that evidence with respect to the proceedings before the Insurance Commissioner was admitted only for the limited purpose of showing, in connection with a potential punitive damages award, "Medical Mutual's state of mind and motives" when it wrote the letter to Evander, Inc.'s clients.

counts fall, both the defamation and the tortious interference." Nevertheless, the court instructed the jury separately on defamation and on wrongful interference. With respect to wrongful interference, the court instructed the jury that "what we're talking about is interference with the business relationship that the plaintiffs had with the doctors, who had been brokered to Medical Mutual by the plaintiffs." The special verdict form asked the jury both whether it found in favor of the plaintiffs on the claim for defamation, and whether it found in favor of the plaintiffs on the claim for wrongful interference with business relationships.

The jury could not reach a verdict on the defamation count, and a mistrial was declared. The jury found in the plaintiffs' favor on the wrongful interference count and awarded the plaintiffs $1,725,000.00 in compensatory damages. In addition, the jury awarded punitive damages against Medical Mutual in the amount of $5,000,000.00 and against Dr. Yow in the amount of $2,000,000.00.

Medical Mutual filed a motion for judgment notwithstanding the verdict or for a new trial, arguing, *inter alia,* that Medical Mutual could not, as a matter of law, tortiously interfere with Evander, Inc.'s business relationships with physicians insured by Medical Mutual, since Medical Mutual was itself a party to the contractual relations. Medical Mutual also renewed its argument that the plaintiffs had failed to prove that the allegedly tortious conduct was the cause of the plaintiffs' economic damage. In addition, Medical Mutual argued that the jury verdicts were inconsistent because, without a jury finding of defamation, there was no basis, under the circumstances of the case, for a finding of wrongful interference with business relations. The trial court denied Medical Mutual's motion and purported to certify the judgment as final under Maryland Rule 2–602.

Medical Mutual appealed to the Court of Special Appeals, making the same arguments that it had presented in its posttrial motion. The intermediate appellate court sustained the award of compensatory damages. *Medical Mutual v. Evan-*

*der,* 92 Md.App. 551, 609 A.2d 353 (1992). With respect to the awards of punitive damages, the Court of Special Appeals held that "there was sufficient evidence from which the jury could have determined [that] there was clear and convincing proof that the Dear Colleague letter was both false and written with actual malice," 92 Md.App. at 571, 609 A.2d at 362, and concluded that there was a basis for a punitive damages award. 92 Md.App. at 576, 609 A.2d at 365. Nevertheless, the Court of Special Appeals vacated the award of punitive damages because it was unclear that the trial court had properly exercised its discretion with respect to post-trial review of the amount of punitive damages. The Court of Special Appeals remanded the case to the trial court for further review of the punitive damages award. 92 Md.App. at 586, 609 A.2d at 370. Medical Mutual filed in this Court a petition for a writ of certiorari which we denied. 328 Md. 447, 614 A.2d 973 (1992).

On remand, Medical Mutual filed a motion for a new trial or for remittitur, and the parties briefed issues relating to the award of punitive damages. After considering various factors relating to the propriety and amount of the punitive damages award, the trial court found that Medical Mutual had acted "intentionally and maliciously with the goal of driving [Mr. Evander] out of business," and that the defendants were able to pay the damages assessed against them. The court denied Medical Mutual's motion and sustained the award of punitive damages.

Medical Mutual appealed to the Court of Special Appeals and, prior to any proceedings in the intermediate appellate court, filed in this Court a petition for a writ of certiorari. Before acting on the petition, this Court, *sua sponte,* directed the parties to file briefs addressing the question of whether the trial court's certification of the judgment as final under Rule 2–602(b) had been proper. After considering the parties' briefs, this Court granted the petition and dismissed the appeal, holding that the circuit court had never entered a final, appealable judgment in the case. *Medical Mutual v. Evander,* 331 Md. 301, 628 A.2d 170 (1993). In particular, this

Court held that the trial court's certification of final judgment under Rule 2–602(b) had been improper because the defamation count and the wrongful interference count involved a single "claim," and no final judgment had been entered on the defamation count. Furthermore, this Court pointed out that Counts III and IV of the plaintiffs' complaint had never been finally disposed of on the trial court's docket.

Thereafter, the trial judge formally dismissed Counts III and IV of the complaint, and permitted the plaintiffs, over Medical Mutual's objection, to dismiss the defamation count without prejudice. Medical Mutual appealed to the Court of Special Appeals and, before any proceedings in the intermediate appellate court, petitioned this Court for a writ of certiorari. We granted Medical Mutual's petition. 335 Md. 225, 642 A.2d 1357 (1994).

In this Court, Medical Mutual argues that the trial court's instructions to the jury contained reversible error, because, although the claimed wrongful interference was based on the allegedly defamatory letter, the trial court did not repeat the defamation instructions regarding conditional privilege when it instructed the jury on wrongful interference. Medical Mutual also challenges the trial court's dismissal of the defamation count. Medical Mutual argues that, because the allegedly tortious conduct that formed the basis of the wrongful interference count was defamation, the plaintiffs could not, by dismissing their defamation count, "drop the central issue, and thereby circumvent the fundamental requirement that defamation be proved and a jury verdict on it obtained in order to hold defendants liable." (Medical Mutual's brief at 23). With respect to the award of compensatory damages, Medical Mutual complains that no distinction was drawn at trial between economic losses suffered by Evander, Inc. and losses suffered by Mr. Evander. Furthermore, Medical Mutual contends that the plaintiffs failed to prove that their economic losses were caused by the allegedly defamatory letter, rather than by Medical Mutual's lawful termination of its relationship with the plaintiffs. Finally, Medical Mutual contends that the awards of punitive damages were excessive.

Medical Mutual does not, in this appeal, argue that the tort of wrongful interference with business relationships does not lie against Medical Mutual under the circumstances because Medical Mutual was a party to the business relationships allegedly interfered with.[7]  Consequently, that argument is not now before us.  Moreover, since we agree with Medical Mutual's argument with respect to causation, we do not reach any other issue raised in the present appeal.

## II.

Medical Mutual contends that the award of compensatory damages must be vacated because the plaintiffs' evidence of causation was insufficient.  Medical Mutual points out that the plaintiffs' evidence of both injury and damages at trial focussed upon the plaintiffs' loss of those physician clients who had been insured with Medical Mutual.  Under these circumstances, Medical Mutual argues, the plaintiffs introduced insufficient evidence from which the jury could reasonably have concluded that the plaintiffs' alleged injuries were caused by Medical Mutual's tortious conduct, rather than by Medical Mutual's lawful termination of its business relationship with Evander, Inc.

It is undisputed that Medical Mutual had the right to terminate its economic relationship with Evander, Inc.  Moreover, the General Assembly has set forth in Code (1957, 1994 Repl.Vol.), Art. 48A, § 234B, specific procedures which an insurer must follow in cancelling an agreement with an agent or broker.  The parties to the present action agree that Medical Mutual properly followed the statutory procedures set

---

7.  As we stated earlier, Medical Mutual insisted at earlier stages of the litigation that the plaintiffs had no cause of action for wrongful interference because the defendants were parties to the business relationships between the plaintiffs and their clients insured with Medical Mutual. Nevertheless, at oral argument in the present appeal, Medical Mutual's attorney stated, in response to a question from this Court, that Medical Mutual was no longer arguing that the tort of wrongful interference with business relationships did not lie under the circumstances of the present case.

forth in § 234B of the Insurance Code. Since Medical Mutual both had the right to sever its business relationship with Evander, Inc., and effected the termination in accordance with the statute, its termination of Evander, Inc. was neither wrongful nor unlawful. *See Travelers Indemnity v. Merling,* 326 Md. 329, 605 A.2d 83, *cert. denied,* —— U.S. ——, 113 S.Ct. 465, 121 L.Ed.2d 373 (1992).

■ Medical Mutual agrees with the plaintiffs that its "decision not to accept insurance business from Evander, Inc. necessarily 'interfered' with Evander, Inc.'s business relationships with its clients: those who wished to remain insured by Medical Mutual could no longer use Evander, Inc. as their broker of record." (Medical Mutual's brief at 28). Nevertheless, as Medical Mutual points out, an insurer's lawful decision to terminate its relationship with a broker or agent, standing alone, cannot form the basis of an action for tortious interference with business relationships. In *Travelers Indemnity v. Merling, supra,* 326 Md. at 344, 605 A.2d at 90, this Court held that where an insurer has the right to end its business relationship with a former agent or broker, and where the statutory procedures for the termination are followed, the termination itself cannot give rise to a cause of action for wrongful interference with business relationships. We explained in *Merling* as follows, (326 Md. at 343–344, 605 A.2d at 90):

> "For one to recover for tortious interference with contractual or economic relations, the interference must have been wrongful or unlawful.... [The insurer's] actions were neither wrongful nor unlawful. Therefore [the insurer] did not tortiously interfere with [the agent's] contractual or economic relations with his clients."

*See also Alexander v. Evander,* 336 Md. 635, 657, 650 A.2d 260, 271 (1994) ("wrongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships").

■ In the present case, the plaintiffs asserted that Medical Mutual's termination of its relationship with Evander, Inc. was wrongful because it was achieved through the allegedly defamatory statements contained in the opening sentences of the "Dear Colleague" letter. In order to establish causation in a wrongful interference action, the plaintiff must prove that the defendant's wrongful or unlawful act caused the destruction of the business relationship which was the target of the interference. *See Alexander v. Evander, supra,* 336 Md. at 652, 650 A.2d at 269; *Macklin v. Logan Associates,* 334 Md. 287, 301–302, 639 A.2d 112, 119 (1994) ("to be actionable, the improper or wrongful conduct must induce the breach or termination of the contract"); *K & K Management v. Lee,* 316 Md. 137, 155, 557 A.2d 965, 973 (1989). Consequently, under the tortious interference theory which they pursued in the present case, the plaintiffs had the burden of proving at trial that the allegedly defamatory language of the "Dear Colleague" letter, rather than the termination of the plaintiffs' relationship with Medical Mutual, caused the plaintiffs' loss of business from Medical Mutual insureds.

■ In any tort action, the plaintiff must establish that the defendant's tortious conduct was a cause in fact of the injury for which compensation is sought. *See, e.g., Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 156–157, 642 A.2d 219, 230 (1994); *Atlantic Mutual v. Kenney,* 323 Md. 116, 127–128, 591 A.2d 507, 512 (1991); *Fennell v. Southern Maryland Hosp.,* 320 Md. 776, 580 A.2d 206 (1990); *Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 713, 501 A.2d 35, 39 (1985); *Empire Realty Co. v. Fleisher,* 269 Md. 278, 284–285, 305 A.2d 144, 147–148 (1973); *Peterson v. Underwood,* 258 Md. 9, 16–17, 264 A.2d 851, 855 (1970) ("[c]ausation in fact is concerned with the ... inquiry of whether defendant's conduct *actually* produced an injury"); *Abend v. Sieber,* 161 Md. 645, 649, 158 A. 63, 64 (1932). Thus, "the burden is on the plaintiff to prove by a preponderance of the evidence that 'it is more probable than not that defendant's act caused his injury.'" *Fennell v. Southern Maryland Hosp., supra,* 320 Md. at 787, 580 A.2d at 211. In addition, the plaintiff must establish that any dam-

ages sought are a "natural, proximate and direct effect of the tortious misconduct." *Jones v. Malinowski,* 299 Md. 257, 269, 473 A.2d 429, 435 (1984). *See also Empire Realty Co. v. Fleisher, supra,* 269 Md. at 284, 305 A.2d at 147; *Ager v. Baltimore Transit Co.,* 213 Md. 414, 421, 132 A.2d 469, 473 (1957); *Plank v. Summers,* 205 Md. 598, 602, 109 A.2d 914, 915–916 (1954); *Mt. Royal Cab Co. v. Dolan,* 166 Md. 581, 584, 171 A. 854, 855 (1934).

Recognizing that a single event is ordinarily the consequence of a number of causes, this Court has stated that the proximate or legal cause of an injury is not necessarily the sole cause. *See, e.g., Atlantic Mutual v. Kenney, supra,* 323 Md. at 127, 591 A.2d at 512. In *Otis Elevator v. LePore,* 229 Md. 52, 58, 181 A.2d 659, 662 (1962), the Court set forth the standards governing the legal sufficiency of evidence of causation as follows:

> " 'Plaintiff is not, however, required to . . . negative entirely the possibility that the defendant's conduct was not a cause, and it is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant['s tortious act] than that it was not.' "

It is also generally true, however, that "an act or omission is not regarded as a cause of an event if the particular event would have occurred without it." Prosser, *Law of Torts* § 41 at 238 (4th ed.1971). As Judge Alvey explained for this Court, a defendant may not be held liable in damages for a plaintiff's loss if he can show "not only that the same loss *might* have happened, but that it *must* have happened if the act complained of had not been done." *Balt. & Potomac R.R. Co. v. Reaney,* 42 Md. 117, 137 (1874). In the present case, Medical Mutual contends that the plaintiffs' loss of business from physicians insured with Medical Mutual was an inevitable consequence of Medical Mutual's termination of its relationship with Evander, Inc. According to Medical Mutual, since the plaintiffs failed to produce any evidence to show that their injuries were caused by the allegedly defamatory content of

the "Dear Colleague" letter, rather than by the termination of the agreement between Medical Mutual and Evander, Inc., there is insufficient evidence of causation to sustain the jury verdict in the plaintiffs' favor.

At trial, the plaintiffs introduced evidence designed to show that they had suffered injury from the allegedly defamatory language of the "Dear Colleague" letter. The plaintiffs established that approximately 480 of 600 Medical Mutual insureds left Evander, Inc. after Medical Mutual had sent out the "Dear Colleague" letter and terminated Evander, Inc.'s right to broker Medical Mutual insurance. The plaintiffs did not introduce any evidence to show that any physician insured with a carrier other than Medical Mutual had stopped doing business with Evander, Inc. on the basis of the "Dear Colleague" letter.

Mr. Evander and four of his former employees each testified that, after the "Dear Colleague" letter had been sent out to Evander, Inc.'s Medical Mutual insureds, many physicians called Evander, Inc. to say that they would no longer use Evander, Inc. as their broker of record. While these witnesses testified generally that a number of physicians had asked what Mr. Evander had "done wrong," not one of the witnesses was able to identify any of these physicians by name. The plaintiffs also introduced into evidence numerous letters received from clients insured with Medical Mutual. These letters informed Evander, Inc. that the physicians were terminating their business relationships with Evander, Inc. None of the letters stated or implied that the physician no longer wished to use Evander, Inc. as a broker because Mr. Evander was "inadequate."

Medical Mutual established at trial that Evander, Inc. knew the name, address and telephone number of every physician who had received the "Dear Colleague" letter. Nevertheless, the plaintiffs did not call a single physician or physician's representative to testify that a decision to leave Evander, Inc. was prompted by a perception that Mr. Evander was "inade-

quate," rather than by a desire to remain insured by Medical Mutual.

Under the circumstances of the present case, the plaintiffs' evidence of causation was insufficient. In light of the plaintiffs' theory of wrongful interference, the jury was required to find, as a basis for a verdict imposing liability upon Medical Mutual, that the alleged defamation in the "Dear Colleague" letter, rather than Medical Mutual's lawful termination of Evander, Inc., caused the plaintiffs' loss of business from Medical Mutual insureds. Nevertheless, the only evidence tending to show that physicians stopped doing business with Evander, Inc. because they believed that the plaintiffs were "inadequate," rather than because they wished to retain their Medical Mutual insurance, was the general testimony of Evander, Inc.'s employees that physicians, who could not be identified at trial, called to cancel their relationships with Evander, Inc. and wanted to know what Mr. Evander had "done wrong." Under the circumstances, this imprecise hearsay testimony was insufficient to support the jury's verdict.

Since the plaintiffs' evidence of causation was insufficient, the award of compensatory and punitive damages must be reversed.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO ENTER JUDGMENT FOR THE DEFENDANTS. PLAINTIFFS TO PAY COSTS.*

ELDRIDGE and RAKER, JJ., join and concur.

CHASANOW and BELL, JJ. dissent.

ELDRIDGE, Judge, concurring:

I agree that the evidence of causation in the present case was insufficient as a matter of law to take the plaintiffs' case to the jury on the tortious interference count. I therefore join the judgment and the opinion of the Court. Nevertheless, I write separately to question, for future purposes, whether the

tort of wrongful interference with business relationships even lies under the circumstances of this case.

The gravamen of the plaintiffs' tortious interference theory was that Medical Mutual had interfered with the business relationships between the plaintiffs and their Medical Mutual insureds. During the earlier stages of the litigation, Medical Mutual responded that the interference tort did not lie because Medical Mutual and Dr. Yow "were parties to the business relationship allegedly interfered with." Medical Mutual did not, however, pursue in the present appeal its argument that the wrongful interference tort would not lie under the circumstances. Consequently, the Court's opinion properly does not deal with the issue. The issue, however, is an important one. The plaintiffs' action for tortious interference against Medical Mutual raises serious questions about the scope of the tort in Maryland. While none of our prior cases is entirely dispositive of the matter, I have serious reservations about whether the interference tort lies in the situation presented here. Perhaps in a future similar case, the parties will raise the issue before this Court.

It is well established in Maryland that the tort of wrongful interference with contract or economic relationships does not lie where the defendant is a party to the contract or economic relationship allegedly interfered with. Most recently, in *Alexander v. Evander*, 336 Md. 635, 645 n. 8, 650 A.2d 260, 265 n. 8 (1994), this Court stated as follows:

"[A] party to contractual relations cannot be liable for the interference tort based on those contractual relations. The tort is aimed at the person who interferes with the contract, and not at one of the contracting parties."

Judge Rodowsky, writing for the Court in *K & K Management v. Lee*, 316 Md. 137, 154–155, 557 A.2d 965, 973 (1989), explained that "[t]ortious interference with business relationships arises only out of the relationships between three parties, the parties to a contract or other economic relationship (P and T) and the interferer (D)." Judge Rodowsky emphasized this point as follows (316 Md. at 155–156, 557 A.2d at 974):

"A two party situation is entirely different. If D interferes with D's own contract with P, D does not, on that ground alone, commit tortious interference, and P's remedy is for breach of the contract between P and D. This Court has 'never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract.' *Wilmington Trust Co. v. Clark,* 289 Md. 313, 329, 424 A.2d 744, 754 (1981). . . . *See also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on The Law of Torts* 990 (5th ed.1984) ('The defendant's breach of his own contract with the plaintiff is of course not a basis for the tort.')"

In *Travelers Indemnity v. Merling,* 326 Md. 329, 605 A.2d 83 (1992), the Court applied the same analytical framework to a situation factually similar to the circumstances of the present case. In *Merling,* an insurance broker alleged, *inter alia,* that an insurer had tortiously interfered with the economic relationships between himself and his clients, the insureds, by wrongfully terminating him as a broker. While this Court's holding in *Merling* with respect to tortious interference was based upon the absence of any wrongful or unlawful conduct by the insurer, we commented upon the tortious interference count as follows (326 Md. at 343, 605 A.2d at 89–90):

"[The broker] appears to recognize that, to the extent that the contractual or economic relations among the clients, [the broker, and the insurer] are reflected in the insurance policies, [the insurer] cannot be guilty of the tort of wrongful interference with contractual or economic relations because it is a party to the insurance policies. For the tort to lie, the defendant tortfeasor cannot be a party to the contractual or economic relations with which he has allegedly interfered. *See, e.g., K & K Management v. Lee,* 316 Md. 137, 154–156, 557 A.2d 965, 973–974 (1989); *Sharrow v. State Farm Mutual,* 306 Md. 754, 763, 511 A.2d 492, 497 (1986); *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 69, 485 A.2d 663, 674 (1984); *Wilmington Trust Co. v. Clark,* 289 Md. 313, 329, 424 A.2d 744, 754 (1981) ('there is no cause of action for interference with a contract when suit is

brought against a party to the contract'); *Shrewsbery v. National Grange Mut. Ins.,* [183 W.Va. 322, 325, 395 S.E.2d 745, 748 (1990) ] ('no one can be liable for tortious interference with his own contract')."

In *Merling* we noted the broker's argument that " '[t]he contract here interfered with is the personal services contract between the independent [insurance] agent and his client, rather than the contract of indemnity issued by the insurer....' " 326 Md. at 343, 605 A.2d at 90. We assumed "arguendo that there existed contracts between [the broker] and the insureds which were separate from the insurance policies and that [the insurer] interfered with those contracts," and could be held liable under the interference tort if the interference were wrongful. *Ibid.*

Likewise, the plaintiffs in the present case sought to establish, in response to Medical Mutual's contention that the interference tort did not lie, that Medical Mutual had interfered with economic relationships between the plaintiffs and their Medical Mutual insureds that were separate from the Medical Mutual insurance contracts. It may be difficult to reconcile the position taken by the plaintiffs with our prior cases. Indeed, if we were to accept the plaintiffs' analysis of the interference tort, it might follow that "only rarely would the breach of a commercial contract fail to be a tort as well." *K & K Management v. Lee, supra,* 316 Md. at 170, 557 A.2d at 981.

According to the plaintiffs' theory, where one party to a business relationship is represented by an agent with respect to that relationship, the other party may, through the conduct of its business with the principal, tortiously interfere with the business relations between the principal and his agent. More generally, the plaintiffs suggest that a principal, his agent with respect to an economic relationship, and the other party to that same relationship, constitute the three parties needed for the interference tort to lie. In other situations, however, this Court has seemed to reject such a view of the tort. Commercial contracts and other business relationships ordinarily involve corporate entities, which can act only through their

agents. Consequently, in *K & K Management v. Lee, supra,* 316 Md. at 170 n. 14, 557 A.2d at 981 n. 14, this Court

"reject[ed] an analysis under which corporate officers, agents or employees, acting on behalf of a corporation within the scope of their authority, are viewed as actors ... separate from their corporation ... and thereby can maliciously interfere with business relations between their corporation ... and the plaintiff...."

We observed that our view was "in accord with the general rule." *Ibid.* (collecting authorities). *See also Bleich v. Florence Crittenton Serv.,* 98 Md.App. 123, 146–148, 632 A.2d 463, 474–475 (1993); Thomas G. Fischer, *Liability of Corporate Director, Officer, or Employee for Tortious Interference with Corporation's Contract With Another,* 72 A.L.R.4th 492 (1989, 1994 Supp.)

By contrast, the plaintiffs' theory of wrongful interference arguably converts into a three-party situation every two-party relationship in which one party is represented by an agent. In agreeing with the plaintiffs' position in the earlier attempted appeal, the Court of Special Appeals adopted the following analysis of the present case (*Medical Mutual v. Evander, supra,* 92 Md.App. at 567 n. 5, 609 A.2d at 360 n. 5):

"[Medical Mutual has] never maintained that Evander did not have prior economic relationships or contracts (albeit contracts at-will) with its physician clients, separate and apart from the insurance policies. It is clear that there were prior independent economic relationships or contracts; Evander's agreements with physicians were to obtain insurance for them. Sometimes Evander obtained that insurance from Medical Mutual; sometimes from other insurers, like PIE. In all events, the agreement to obtain insurance was independent of the insurance policy itself. *Compare Travelers Indemnity v. Merling,* 326 Md. at 343, 605 A.2d 83 (in which this was simply assumed 'arguendo')."

It is typically true, however, that when a principal retains an agent to procure goods or services for the principal, the agency relationship between principal and agent almost invari-

ably precedes the formation of contractual or business relationships between the two principals. Furthermore, whether the agent is retained as an employee or as an independent contractor, the agent may represent the principal in a number of different transactions on different occasions. Consequently, there are likely to be dealings and relationships between the principal and agent which are separate from any particular contractual or business relationship between the principal and a third party. Nevertheless, our cases suggest that neither party to a specific economic relationship is liable for the wrongful interference tort in connection with its conduct of that relationship.

The basis of the plaintiffs' tortious interference theory in the present case was Medical Mutual's alleged interference with relationships that existed between the plaintiffs and their clients insured with Medical Mutual at the time of the interference. The business relationships among the plaintiffs, their Medical Mutual insureds, and Medical Mutual were bound up in the policies of insurance issued by Medical Mutual. Mr. Evander and Evander, Inc. acted as the agents for their physician clients in procuring, servicing and renewing Medical Mutual malpractice liability policies.[1] Moreover, because the plaintiffs derived their income from commissions for the business they procured, the economic losses which the plaintiffs claimed to have suffered as a result of the Medical Mutual's allegedly tortious interference were the lost commissions that Medical Mutual would have paid on the basis of insurance

---

1. I use the term "agent" in its agency law sense, and not as the term is sometimes used in insurance law. In Maryland, the Insurance Code defines "agent" as "a person who for compensation in any manner solicits, procures, or negotiates insurance contracts . . . on the behalf of organizations issuing the contracts." Code (1957, 1994 Repl.Vol.), Art. 48A, § 166(a). By contrast, the Code defines a "broker" as "a person who for compensation in any manner solicits, procures or negotiates insurance contracts . . . on behalf of insureds or prospective insureds other than himself and not on behalf of an insurer or agent." *Id.* at § 166(c). Consequently, while Mr. Evander and Evander, Inc. were "brokers" within the meaning of the Insurance Code, they nonetheless acted as agents, in the agency law sense, on behalf of their clients, the insureds.

policies issued to the plaintiffs' clients. Under these circumstances, it is questionable that the three-party situation which forms the predicate of a wrongful interference action exists in the present case. If Medical Mutual was a party to the business relationships between the plaintiffs and their clients insured with Medical Mutual, it may be doubtful, as a matter of law, that it could be held liable for tortiously interfering with business relationships between the plaintiffs and their Medical Mutual insureds.

Judge RAKER has authorized me to state that she concurs with the views expressed herein.

BELL, Judge, dissenting.

Before reading the majority opinion, I did not know that the causative relationship between a plaintiff's injuries and a defendant's tortious interference with business relationships had to be proven by direct, as opposed to circumstantial, evidence. In fact, I believed, and, indeed, case law supports that, under Maryland law, circumstantial evidence is as competent and as admissible as, *Hebron v. State*, 331 Md. 219, 226, 627 A.2d 1029, 1032–33 (1993); *Wiggins v. State*, 324 Md. 551, 567, 597 A.2d 1359, 1367 (1991), cert. denied, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992); *Wilson v. State*, 319 Md. 530, 537, 573 A.2d 831, 834 (1990); *West v. State*, 312 Md. 197, 211–12, 539 A.2d 231, 238 (1988); *Nalee, Inc. v. Jacobs*, 228 Md. 525, 531, 180 A.2d 677, 680 (1962); *Ambassador Apartment Corporation v. McCauley*, 182 Md. 275, 279, 34 A.2d 333, 334 (1943); *Baltimore American Underwriters of Baltimore American Insurance Co. v. Beckley*, 173 Md. 202, 207, 195 A. 550, 552 (1937); *Burke v. City of Baltimore*, 127 Md. 554, 562, 96 A. 693, 696 (1916); *Owens–Illinois v. Armstrong*, 87 Md.App. 699, 717, 591 A.2d 544, 552 (1991), *aff'd in part, rev'd in part*, 326 Md. 107, 604 A.2d 47, *cert. denied*, —— U.S. ——, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992); *McSlarrow v. Walker*, 56 Md.App. 151, 159, 467 A.2d 196, 200, *cert. denied*, 299 Md. 137, 472 A.2d 1000 (1984), and in some instances is more persuasive than, direct evidence. *See Henderson v. Maryland National Bank*, 278 Md. 514, 522–23,

366 A.2d 1, 6 (1976); *Board of County Commissioners of Frederick County v. Dorcus,* 247 Md. 251, 259, 230 A.2d 656, 661 (1967); *Steinla v. Steinla,* 178 Md. 367, 373, 13 A.2d 534, 536 (1940). This is true even when the burden of proof is greater than by a preponderance of the evidence. *See Steinla,* 178 Md. at 373, 13 A.2d at 536; *Lussier v. Maryland Racing Commission,* 100 Md.App. 190, 217–19, 640 A.2d 259, 273–74, *cert. granted,* 336 Md. 405, 648 A.2d 991 (1994). Therefore, I was surprised, to say the least, when the majority held that the evidence of causation proffered by Evander in this case was insufficient as a matter of law. More to the point, since the majority does not purport to change Maryland law, I was, and remain, convinced, that the majority is just plain wrong.

There is no dispute as to the causation evidence. Evander and his employees testified at some length to being inundated with telephone calls and letters from physicians who asked what he had done to deserve Medical Mutual's characterization of his services as "inadequate." They also testified that the physicians declined to do further business with Evander because they did not believe Medical Mutual was simply upset that Evander was marketing its competition. Evander's evidence further showed that Medical Mutual received no complaints from any physician concerning Evander's "inadequacy." He also established, through several of Medical Mutual's officers, that Evander was terminated because of his association with Medical Mutual's competitor.

Characterizing Evander's testimony as "general," Majority Op. 339 Md. at 56, 660 A.2d at 440, and noting that Evander neither identified nor called even one of the inquiring doctors to testify as to why he or she ceased using Evander's services, the majority rejects Evander's "imprecise hearsay testimony," finding it insufficient to support the jury's verdict. Statements of the doctors' then existing state of mind and motive offered to prove the doctors' future action may be hearsay, but those statements are a well recognized exception to the rule prohibiting hearsay and are admissible as substantive evidence. *See* Maryland Rule 5–803 which states in pertinent part:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(b) Other Exceptions

(3) Then Existing Mental, Emotional, or Physical Condition

*A statement of the declarant's then existing state of mind,* emotion, sensation, or physical condition (such as intent, plan, *motive,* design, mental feeling, pain, and bodily health), *offered to prove* the declarant's then existing condition or *the declarant's future action....*" (Emphasis added).

Moreover, the Court of Special Appeals, responding to the identical argument, reached what I believe is a correct conclusion. It pointed out that the testimony offered by Evander "was certainly competent evidence of injury caused by [Medical Mutual's] wrongful act," *Medical Mutual Liability Insurance Society of Maryland v. Evander & Associates, Inc.,* 92 Md.App. 551, 575, 609 A.2d 353, 364 (1992), and that the failure to produce direct evidence as to the reason that his services were no longer used by certain physicians "provided [Medical Mutual] with material for cross-examination and jury argument." *Id.* at 574, 609 A.2d at 364.

What we are here faced with is a question of the sufficiency of the evidence to prove causation. It is well established in Maryland that the test of sufficiency is whether there is any evidence in the case, no matter how slight, legally sufficient as tending to be probative of the proposition at issue. *See Cavacos v. Sarwar,* 313 Md. 248, 258, 545 A.2d 46, 51 (1988); *Beahm v. Shortall,* 279 Md. 321, 341–42, 368 A.2d 1005, 1017 (1977); *Curley v. General Valet Service, Inc.,* 270 Md. 248, 264, 311 A.2d 231, 239–40 (1973); *Perlin Packing Company, Inc. v. Price,* 247 Md. 475, 483, 231 A.2d 702, 707 (1967); *Fowler v. Smith,* 240 Md. 240, 246–47, 213 A.2d 549, 553–54 (1965); *McSlarrow v. Walker, supra,* 56 Md.App. at 159, 467 A.2d at 200; *Brock v. Sorrell,* 15 Md.App. 1, 6–7, 288 A.2d 640, 643–44 (1972). Indeed "Maryland has gone almost as far as any jurisdiction that we know of in holding that meager

evidence [of causation] is sufficient to carry the case to the jury." *Fowler*, 240 Md. at 246, 213 A.2d at 554. Certainly, *albeit* circumstantial, the receipt by Evander of a number of letters and telephone calls inquiring as to what Evander had done wrong, coupled with the subsequent non-renewal by many of the inquiring physicians, of the business relationship with Evander, is some evidence, however one might characterize it or assess its weight, that a wrongful act caused Evander actual damages. To be sure, that same proposition could be proven by more direct evidence, *i.e.*, the testimony of one or more of the physicians who refused to continue the use of Evander's services. That Evander did not choose to proceed in that fashion affects the weight, rather than the admissibility, of the evidence; it is such as to provide the proponent with material for cross-examination and jury argument. *Medical Mutual v. Evander*, 92 Md.App. at 574, 609 A.2d at 364. Characterizing the evidence as "imprecise hearsay" does not change its essential nature; it remains probative of the proposition for which it was offered. Unless circumstantial evidence is not probative of causation at all, a fact which by no means is so under Maryland law, finding the evidence of causation insufficient requires that there be no such evidence in the record. Because that clearly is not the case here, I dissent.

In a concurring opinion, Judge Eldridge suggests that the tort of wrongful interference with business relationship may not lie under the circumstances of the instant case. I disagree. Judge Eldridge attempts to expand unduly two doctrines precluding tortious interference claims. The first is the well-settled principle that if two parties have a contract and one breaches the contract, the other contracting party cannot convert a breach of contract action into a tort action and sue for tortious interference with contract. See *K & K Management v. Lee*, 316 Md. 137, 557 A.2d 965 (1989), in which Judge Rodowsky, writing for the Court, explained that "[t]ortious interference with business relationships arises only out of the relationships between three parties, the parties to a contract or other economic relationship (P and T) and the interferer

(D)." 316 Md. at 154, 557 A.2d at 973. Judge Eldridge, quoting *dicta* from that case, emphasized the point as follows:

" 'A two party situation is entirely different. If D interferes with D's own contract with P, D does not, on that ground alone, commit tortious interference, and P's remedy is for breach of the contract between P and D. This Court has "never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract." *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744, 754 (1981). . . . *See also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on The Law of Torts* 990 (5th ed.1984) ("The defendant's breach of his own contract with the plaintiff is of course not a basis for the tort").' "

339 Md. at 59, 660 A.2d at 441–42 (quoting *K & K Management*, 316 Md. at 155–56, 557 A.2d at 974).

The second principle unduly expanded is the rule that where a corporation has a contract with the plaintiff, and a corporate officer or employee, acting to serve the interests of the corporation, interferes with the contract, the officer or employee is not personally liable for tortious interference because when acting within the scope of authority and in the interest of the corporation, the agent or employee is the alter ego of the corporation. The cases, however, make clear that, generally, if the corporate officer or employee is acting outside the scope of authority or to serve his or her own interests or with malice, then the corporate officer or employee is no longer acting as the alter ego of the corporation and is personally liable. *See generally* Thomas G. Fischer, Liability of Corporate Director, Officer, or Employee for Tortious Interference With Corporation's Contract with Another, 72 A.L.R.4th 492 (1989 & 1994 Supp.).

These two principles should not be expanded into the doctrine Judge Eldridge suggests, *i.e.*, that "neither party to a specific economic relationship is liable for the wrongful interference tort in connection with its conduct of that relationship." 339 Md. at 61–62, 660 A.2d at 443. As applied in the

instant case, Judge Eldridge's suggested rule of law is "[i]f Medical Mutual was a party to the business relationships between the plaintiffs and their clients insured with Medical Mutual, it may be doubtful, as a matter of law, that it could be held liable for tortiously interfering with business relationships between the plaintiffs and their Medical Mutual insureds." 339 Md. at 63, 660 A.2d at 443.

There are several Maryland cases on the tort of interference with economic relations that are not cited in the concurring opinion, but may be relevant to the issue. *See Sharrow v. State Farm Mutual Automobile Insurance Co.*, 306 Md. 754, 511 A.2d 492 (1986); *Knickerbocker Co. v. Gardiner Co.*, 107 Md. 556, 69 A. 405 (1908); *Lucke v. Clothing Cutters & Trimmers Assembly*, 77 Md. 396, 26 A. 505 (1893). *See also* WADE R. HABEEB, LIABILITY OF ONE WHO INDUCES TERMINATION OF EMPLOYMENT OF ANOTHER BY THREATENING TO END OWN CONTRACTUAL RELATIONSHIP WITH EMPLOYER, 79 A.L.R.3d 672 (1977); in which the author observes:

> "it has been held in a number of cases that one who maliciously or without lawful right threatens to end his own contractual relationship with an employer for the purpose of procuring the termination of employment of another is liable to the employee....
>
> Concomitantly, in some cases the courts have held that one who in the *justifiable exercise of his lawful rights* threatens to end his own contractual relationship with an employer and thus induces the termination of employment of another is not liable to the employee." (Emphasis added) (footnotes omitted).

79 A.L.R.3d at 675.

It is interesting to note that the cases go quite far in protecting even employment-at-will contracts from malicious wrongful interference by parties contracting with employers. Citing almost a dozen cases, the A.L.R. annotation concludes:

> "It has been generally held that the fact that the employment is at will and that the employer is free from liability for discharging an employee does not carry immunity to a

person who, without justification, induces the discharge of the employee by threatening to end his own contractual relationship with the employer."

79 A.L.R. at 679.

There simply is nothing in the circumstances of the instant case which would insulate Medical Mutual from liability for wrongful interference with business relationship. In this case, all of the elements of the tort have been proven.

CHASANOW, J., joins in this opinion.